**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**KIMYETTA SELDON-WHITTAKER,**

                  **Plaintiff(s),**          **CASE NUMBER: 05-70641**
                                          **HONORABLE VICTORIA A. ROBERTS**

**v.**

**HCR MANOR CARE, HEALTH CARE**
**AND RETIREMENT CORPORATION**
**OF AMERICA d/b/a HEARTLAND**
**HEALTH CARE CENTER - PLYMOUTH**
**COURT and BYRON BROWN,**

                  **Defendant(s).**
_____/

**OPINION AND ORDER GRANTING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

      This matter is before the Court on Defendant's Motion for Summary Judgment.

For the reasons stated below, the Court **GRANTS** Defendant's motion.

**II.     BACKGROUND**

      Plaintiff Kimyetta Seldon-Whittaker is suing her former employer, Defendant HCR

Manor Care, Health Care and Retirement Corporation of America d/b/a Heartland

Health Care Center--Plymouth Court ("HCR").[1]  It is not clear whether HCR and Health

Care and Retirement Corporation are one or two entities.  In the briefs and throughout

the record, the parties vacillate between referring to them singularly and plurally.  The

_____

[1]Plaintiff also sued her former co-worker, Byron Brown.  However, Plaintiff never
served Mr. Brown.

Court refers to them as one entity.  Plaintiff alleges sex and disability discrimination, retaliation and hostile work environment sexual harassment.

      A.     Sexual Harassment by Byron Brown

Plaintiff began working for Defendant as a central supply clerk on July 30, 2001. She was responsible for insuring that supplies and equipment for the facility were ordered, organized, distributed and billed.  She says that one of her co-workers, Byron Brown, began making unwelcome sexual comments to her shortly after she began working.  Per Plaintiff, Brown's persistent comments pertained to her buttocks, his genitalia, his sexual prowess and anal sex.

Defendant has a written sexual harassment policy, which advises employees to immediately report concerns to a supervisor or human resource designee, or file a complaint through the Employee Complaint Procedure or Defendant's "Care Line," which is accessible by a toll free telephone number.  Def. Exh. V.  The policy is included in Defendant's employee handbook, which Plaintiff received when she was hired and each year thereafter.

Plaintiff says she first reported Brown's behavior in October 2001 to acting Administrator Ruth Proffer.  Per Plaintiff, Proffer promised to talk to him.  Thereafter, Brown stopped making inappropriate comments for a while.  But, in December 2001, she says that his behavior resumed.  Plaintiff says that she complained again to Proffer's successor, Pat Tyler.  But, during Defendant's internal investigation, Tyler denied that Plaintiff made any such report.  Def. Exh. G.  Tyler said that Plaintiff complained that Brown joked and played around and was not much help, but that she did not complain of sexual harassment.  *Id.*

2

On January 23, 2002, Plaintiff wrote a letter to her supervisor, Karen Fairchild, recounting an incident that occurred with Brown the day before.  Def. Exh. H.  In the morning on January 22nd, Plaintiff says Fairchild asked that she prepare a list of tasks Brown could perform and give it to her at 3:00 p.m. that day.  At approximately 2:00 p.m., Plaintiff said that Brown came into her office and told her that they were to meet with Fairchild at 3:00 p.m.  Brown then engaged Plaintiff in small talk and, when he apparently thought he caught her unaware, stuffed snow down the front of her shirt.  In the process of doing so, Plaintiff says that he grabbed her breast and tore her bra. Brown then ran out of the office laughing.  Plaintiff chased him and said that she would "get him back and good."

Plaintiff then suggests that she and Brown worked together sometime later that day.  Plaintiff says that Brown asked her if she had certain supplies he needed.  Plaintiff says she told him that she had what he needed in her work room.  He followed her there and they worked together without incident.

The letter then seems to indicate that Brown was upset with Plaintiff the following morning because Plaintiff gave Fairchild the list of tasks for him.  Plaintiff says Brown would not speak to her, but that she persisted in trying to explain that his work assignment was not her fault.  Plaintiff said she told him that they were "cool" before the meeting the prior day, presumably referring to the meeting with Fairchild.

At the end of  the letter, as an aside that seems to refer back to January 22, 2002, Plaintiff says that Brown commented in front of others in an elevator that she must be cold because her "headlights were on," an apparent reference to her breasts. Plaintiff then says that Brown began telling another employee on the elevator about

3

"what he did to me," seemingly referring to the snow incident.  Plaintiff closes by saying that, after the meeting (presumably with Fairchild), Brown continued to act upset with her for the rest of the day.

Notably, although Plaintiff says that the snow incident happened one hour before she and Brown were to meet with Fairchild to discuss a work assignment, she did not report the incident to Fairchild until the next day.  In her deposition, Plaintiff claims that the letter does not accurately state the sequence of events.  She says that she did not meet with Brown and Fairchild together on January 22, 2002; she only went in while they were meeting to give Fairchild the list of assignments that Fairchild requested.  Per Plaintiff, the snow incident did not occur until afterwards.  So, Plaintiff says she drafted a letter about the incident later that day and talked with Fairchild about it the following day.  And, Plaintiff said that the "headlight" comment was actually made one month prior, in December 2001.

Fairchild apparently confronted Brown about the incident, but there is no evidence of whether he was disciplined.  But, Plaintiff was written-up for swearing at Brown in front of a resident during the incident.  After she was disciplined, on January 25, 2002, Plaintiff wrote a letter to Administrator Amy Lefluer (who presumably succeeded Tyler) complaining that she was unhappy with the way the snow incident was handled and that the response to her earlier complaints about Brown's behavior was also inadequate.  On January 28, 2002, Plaintiff also filed a police report against Brown.[2]

---

[2]The parties do not indicate whether charges resulted from the criminal complaint.

Defendant says that there is no record of Plaintiff having complained of sexual harassment by Brown prior to her January 25, 2002 letter.  Within a few days, Defendant conducted an investigation, which included questioning Brown and other employees.

Brown admitted putting snow down Plaintiff's shirt, but said that she had done the same to him on a prior occasion.  Brown also admitted that he engaged in sexual banter with Plaintiff but claimed that Plaintiff encouraged and participated in it by making sexual comments to him, laughing and joking.  He said that she never told him that his behavior was unwelcome.  Brown denied making the "headlight" comment.  Another employee who was nearby at the time, Mary Oliverson, said that she made the headlight reference.

Most employees denied witnessing any sexual comments or behavior between Plaintiff and Brown; several employees did say that Brown and Plaintiff had a joking relationship.  Two employees corroborated some of Brown's claims regarding the reciprocal nature of their interaction.  Felicia Booker said that Plaintiff and Brown "played" with each other all the time, and that Plaintiff never complained to her about Brown.  Def. Exh.G.  When asked for examples of their banter, Booker said that Brown once called Plaintiff fat and that she responded by saying "you wish you could have me."  Booker also said that Plaintiff laughed after Brown put snow down her shirt and joked about getting him back.  Another employee, Aurora Carter, said that Plaintiff and Brown "played around" and made sexual comments to one another a lot.  When asked for examples, Carter said that she heard Plaintiff make jokes about the size of Brown's penis.  Carter also said that she saw Plaintiff throw a snowball at Brown after the

5

incident on January 22, 2002.

There is no evidence regarding whether Brown was disciplined at the conclusion of Defendant's investigation.  But, an "in-service" was held, where employees were required to watch a videotape regarding Defendant's sexual harassment policy.   And, although Plaintiff says she was required to continue working with Brown, she says that he did not make any further sexual overtures.

B.    Plaintiff's Performance, Disability and Termination

Defendant contends that Plaintiff had persistent performance problems which began early in her tenure.  Plaintiff's 90-day evaluation on December 14, 2001 indicates that Plaintiff needed to improve in completing assigned tasks in a timely fashion, properly storing excess supplies and equipment, billing for resident supplies and maintaining a budget.  Def. Exh. C.  The evaluation also indicates that Plaintiff had difficulty maintaining "par levels"[2] at each nurses' station and tracing missing charges with the assistance of the nursing department.  *Id.*

Plaintiff's second evaluation on August 1, 2002 rated her performance in numerous areas on a scale of 1 to 5; 1 was "unsatisfactory," and 5 was "outstanding." Defendant points out that Plaintiff was only rated a 2 ("meets some requirements") in the category entitled "Takes inventory of and rotates stocked items daily, and maintains monthly inventory of all nursing supplies."  Def. Exh. C.  However, Plaintiff received ratings of 3 ("meets all requirements") and 4 ("exceeds requirements") in most other areas, including those which she previously was deemed to need improvement, and a 5

---

[2]The parties do not explain "par levels."

in one area.

Plaintiff's evaluations sharply declined in 2003 and 2004.  On August 10, 2003, she received ratings of 1 or 2 in seven categories.  Def. Exh C.  Defendant also provides an unsigned memo it refers to as an informal Performance Improvement Action Plan ("PIAP"), which is dated September 8, 2003.  Def. Exh. K.  The memo states that a formal PIAP was not necessary at that time, but notes that there were weaknesses in Plaintiff's prior evaluation and lists Defendant's expectations of Plaintiff in certain areas.  The list was to be reviewed in 60 days to determine whether their expectations were being met, or if further action was necessary.  It is not clear who authored the memo or whether Plaintiff ever received it.

On July 8, 2004, Plaintiff was evaluated again and received ratings of 1 or 2 in ten categories.  *Id.*  Shortly thereafter, from July 16, 2004 to August 2, 2004, Plaintiff took medical leave due to depression.  Def. Exh. L.

Plaintiff returned to work on August 3, 2004.  On the same day, Plaintiff's physician evaluated her and wrote a letter recommending that Plaintiff not work more than 6 hours per day for two weeks.  Def. Exh. N.  Plaintiff gave Defendant the letter on the day of her return.  But, despite her physician's recommendation, she worked over 7 hours for approximately one week.  Plaintiff says that she was told that she had to continue her full time schedule until the schedule was redone.  Pl. Exh. 34 at p. 55.  Defendant says that it was deciding whether her request would be accommodated.

The day after Plaintiff returned from leave, on August 4, 2004, she was put on a 60-day PIAP.  Defendant purportedly imposed the plan to help Plaintiff improve her job performance.  Plaintiff was advised that any violation of the plan would be cause for her

7

termination.  Defendant says the action was taken because of Plaintiff's continued poor performance.  On August 5th, Plaintiff wrote a letter to her supervisor, Karen Fairchild, stating that she believed that the PIAP was implemented because of her medical condition.  Pl. Exh. 12.

On August 10, 2004, Plaintiff met with Fairchild and two other superiors, Jennifer Pressman and Felicia Murden.  Plaintiff requested the meeting to discuss her disagreement over the assignment of certain tasks that she had been given by Pressman.  Plaintiff refused to do things that she regarded as outside of the scope of her duties.  Even though Defendant says Plaintiff's refusal was an act of insubordination, there is no evidence that it took disciplinary action against her.

Before Defendant decided whether to allow the abbreviated work schedule recommended by Plaintiff's doctor on August 3, 2004, Plaintiff was diagnosed with Bi-polar Disorder.  She took another leave which began on August 11, 2004.

Plaintiff asserts that she became ill because of Defendant's failure to accommodate her medical needs and the unwarranted PIAP.  Plaintiff says her accommodation requests were for an abbreviated work schedule and leave to attend doctor appointments.  Defendant denies that Plaintiff ever made specific requests for time off to attend appointments and presents evidence which suggests that Plaintiff attended all of them.  Plaintiff does not indicate when or how she made the requests.  She simply notes that, in each Certification completed by Plaintiff's physician in support of her request for leave, her doctor indicated that she required weekly psychotherapy sessions.  Pl. Exhs. 10, 16; Def. Exh. Q.

Plaintiff returned to work on September 23, 2004.  From the date of her return

8

until October 11, 2004, Plaintiff worked approximately 4 hours per day, even though Defendants say that she did not provide a recommendation from her physician for the abbreviated work schedule.  Plaintiff disputes Defendant's claim and provides a letter from her physician, dated September 22, 2004, indicating that she was not to work more than 4 ½ hours per day for two weeks.  Plaintiff also contends that Defendant's awareness of her work restriction is evidenced by a letter, dated September 23, 2004, from the short-term disability claims administrator indicating that Plaintiff was to return to work "with restrictions."  Pl. Exh. 19.

On October 12, 2004, Defendant renewed Plaintiff's PIAP.  Plaintiff began working approximately 6 hours per day.  Plaintiff maintained that schedule from October 12, 2004 through December 8, 2004.  However, Defendant points out that Plaintiff's physician did not evaluate her and recommend a 6-hour work day until October 20, 2004 (and again on November 29, 2004).  Plaintiff says Defendant did not strictly adhere to her work limitation because she was sometimes required to work more than 6 hours.

On December 6, 2004, Plaintiff was advised during another review of the PIAP that she would be fired if her performance did not improve within 60 days.  Two days later, Plaintiff left early claiming was ill.  Before Plaintiff left, Carter says that she attempted to schedule a meeting with Plaintiff for December 9th or 10th to review her performance under the PIAP.[3]  Per Carter, Plaintiff said that she would not be back until the following Monday, December 13th.  Carter advised against the delayed return since

---

[3]Carter's assertions are stated in an unsworn memo dated December 8, 2004. Def. Exh. R.

the PIAP was scheduled to end on December 11th.  Carter says Plaintiff responded by stating that she felt harassed.

On December 9th, Plaintiff gave deposition testimony against Defendant in a lawsuit filed by her co-worker, Tonya Powell-Lee.  Ms. Powell-Lee sued for sexual harassment.  Plaintiff says that her testimony was favorable to Ms. Powell-Lee.

Also on December 9th, Pressman found out that Plaintiff had not ordered certain supplies that were needed for residents over the weekend.  Plaintiff did not advise anyone that she failed to order the supplies before leaving the day before.  Pressman had to get the needed supplies from several other facilities.  On or sometime after September 9th, Pressman said that the supply shortage prompted her to initiate the first discussion with Fairchild about firing Plaintiff.  Pressman denied that either Plaintiff's testimony in Ms. Powell-Lee's case or her medical condition was a factor in her decision.

On December 10th, Plaintiff's physician sent a letter to Defendant indicating that Plaintiff was taking another medical leave, effective December 9, 2004 and continuing through December 17, 2004.  Plaintiff's physician subsequently completed a Certification of Health Care Provider Form indicating that her leave would extend to January 30, 2005.  Pl. Exh. 31.

On January 6, 2005, Pressman sent Plaintiff a "second notice"[4] that she was terminated effective December 8, 2004, due to her failure to meet the required goals outlined in her PIAP.

_____

[4]The parties do not indicate when (or if) a first notice was sent and/or received by Plaintiff.

10

On January 21, 2005, Plaintiff filed this suit alleging employment discrimination. In Count I, she alleges violation of the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. §37.1201, *et seq.*  In Counts II through IV, she alleges sex discrimination, hostile work environment sexual harassment, and retaliation, respectively, in violation of the Elliott-Larsen Civil Rights Act, M.C.L. §37.2101, *et seq.* Lastly, in Count V, she alleges intentional infliction of emotional distress ("IIED"). Defendant requests summary judgment on each claim.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th  Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule

56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing

out to the court that the nonmoving party, having had sufficient opportunity for

discovery, has no evidence to support an essential element of his or her case, and on

which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*,

48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989).

The moving party does not, however, have to support its motion for summary judgment

with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving

party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d

at 150.  The nonmoving party cannot rest on its pleadings, but must present significant

probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere

existence of a scintilla of evidence to support the nonmoving party position will be

insufficient; there must be evidence on which a jury could reasonably find for the

nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    APPLICABLE LAW AND ANALYSIS

### A.    MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

The PWDCRA requires an employer to "accommodate a person with a disability .

. . unless the person demonstrates that the accommodation would impose an undue

hardship."  M.C.L. §37.1102(2).  Plaintiff suffers from bipolar disorder and contends that

Defendant violated the PWDCRA by failing to reasonably accommodate her need for

reduced work hours and time to attend therapy sessions.  However, Defendant asserts

12

that Plaintiff failed to establish that her condition constitutes a "disability" within the meaning of the PWDCRA.  Defendant is correct.

The Act defines a disability as:

> (*i*) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

> (A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

M.C.L. §37.1103(d)(i)(A).  There is a three-step test to determine whether a plaintiff is disabled within the meaning of the Act: 1) whether the employee's complaint was a physical impairment; 2) whether the life activity allegedly affected constitutes a major life activity; and 3) whether the impairments substantially limited the major life activity. *Chiles v Machine Shop, Inc.,* 238 Mich. App. 462, 474 (1999).

"Major life activities" include "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'" *Chiles,* 238 Mich. App. at 477 (*quoting Stevens v Inland Waters, Inc.,* 220 Mich. App. 212, 217 (1996)).  "Whether an impairment *substantially* limits a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term effect." *Lown v JJ Eaton Place*, 235 Mich. App. 721, 726 (1999)(emphasis added).

Plaintiff does not identify any major life activity outside of work which was substantially limited by her mental condition.  And, she testified that her condition did not interfere with her ability to do her job.  Pl. Exh. 34 at pp. 62, 86.  Consequently,

13

Plaintiff failed to make a *prima facie* showing that she was disabled within the meaning

of the PWDCRA.  Defendant's motion for summary judgment on Count I is granted.

## B.    SEX DISCRIMINATION

The Elliott-Larsen Civil Rights Act ("ELCRA") prohibits an employer from

"discriminat[ing] against an individual with respect to employment, compensation, or a

term, condition, or privilege of employment, because of . . .  sex."  M.C.L.

§37.2202(1)(a).  "[T]he essence of a sex discrimination civil rights suit is that similarly

situated people have been treated differently because of their sex."  *Radtke v Everette,*

442 Mich. 368, 379 (1998).

In her Complaint, Plaintiff alleges that she endured "humiliation and

discrimination to which other workers were not subjected, all because of her sex."  Pl.

Complaint at ¶38.  In her deposition, Plaintiff further explained that it is her contention

that Defendant's male employees were not subjected to the same sexual harassment

as its female employees.  Def. Exh. E at pp. 145-146.

Plaintiff presumably abandoned this claim, however, since she did not make any

argument or provide any evidence in support of it in response to Defendant's request for

summary judgment.  Furthermore, during her deposition, Plaintiff admitted that she does

not know whether any male employees were subjected to sexual harassment.  Def.

Exh. E at pp. 145-146.

Defendant's motion for summary judgment on Count II is granted.

## C.    HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT

In Count III, Plaintiff alleges that the alleged sexual harassment she endured by

14

Byron Brown between August 2001 and January 2002 created a hostile work environment in violation of the ELCRA.  To prove this claim, Plaintiff must show:  (1) that she belonged to a protected group; (2) that she was subjected to communication or conduct on the basis of sex; (3) that she was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior. *Sheridan v Forest Hills Public Schools,* 247 Mich. App. 611, 621 (2001).

Defendant asserts that the alleged incidents which occurred prior to January 21, 2002 are barred by the statute of limitations, and that Plaintiff failed to establish that the single incident that occurred after January 21, 2002 created a hostile work environment.

### a.      Statute of Limitations

Employment discrimination claims brought under the ELCRA must be filed within three years of accrual.  *Womack Scott v Department of Corrections*, 246 Mich. App. 70, 74 (2001); *Magee v DaimlerChrysler Corp.,* 472 Mich. 108, 113 (2005).

Plaintiff filed this lawsuit on January 21, 2005.  She does not dispute Defendant's assertion that she cannot base her claim on any incidents which allegedly occurred prior to January 21, 2002.  However, for the claim which falls within the statute of limitations, she contends that the Court must look at the "totality of circumstances" to determine whether she was subjected to a hostile work environment.  Therefore, she argues that the time-barred incidents are relevant to the Court's analysis.

Plaintiff bases this assertion on several federal court decisions regarding claims of harassment or discrimination brought under Title VII of the Civil Rights Act of 1964,

15

42 U.S.C. §2000e.  In *United States v Evans,* 431 U.S. 553, 558 (1977), the United

States Supreme Court held that acts of discrimination which are time-barred may,

nevertheless, be considered as "relevant background evidence in a proceeding in which

the status of a current practice is at issue."  Consistent with *Evans*, the Fifth Circuit in

*Cortes v Maxus Exploration Co.,* 977 F.2d 195, 200 (5th Cir. 1992), held that time-barred

acts of sexual harassment may be considered "to illuminate current practices which,

viewed in isolation, may not indicate discriminatory motives."  (citation omitted).  The

Sixth Circuit in *Jackson v Quanex Corp.,* 191 F.3d 647, 668 (6th Cir. 1999), cited both

*Evans* and *Cortes* with favor and held that:

> [E]vidence of acts [of racial harassment] occurring before the
> limitations period were relevant to determinations of whether the
> environment at Quanex was objectively or subjectively hostile, and of
> whether the response of Quanex management to alleged
> harassment was reasonable in light of what it knew or should have
> known.

Defendant contends that Plaintiff's reliance upon *Evans* and its progeny is

misplaced because there was no discriminatory practice at issue after Plaintiff reported

the snow incident on January 22, 2002 (because remedial action was taken and the

harassment ended).  Further, Defendant argues that, since the Michigan Supreme

Court abolished the "continuing violation" doctrine,[5] *see Garg v Macomb County

Community Mental Health Services,* 472 Mich. 263 (2005), Michigan courts explicitly

prohibit consideration of time-barred acts for any purpose.

---

[5]The continuing violation doctrine recognized an exception to the statute of
limitations where an employee alleged a series of discriminatory acts, including ones
which occurred outside the statute of limitations, that were sufficiently related to
constitute a pattern, if at least one of the acts occurred within the limitation period.  *See
Sumner v Goodyear Tire & Rubber Co.,* 427 Mich. 505 (1986).

In *Garg*, Plaintiff alleged that she was subjected to retaliation for eleven years after she filed a grievance alleging national origin discrimination.  But, the acts which occurred during the first five years after the grievance was filed were outside the statute of limitations.  Nevertheless, the trial court and the Court of Appeals permitted Plaintiff to recover for the time-barred acts pursuant to the continuing violation doctrine.  The Michigan Supreme Court, however, held that the continuing violation doctrine was inconsistent with the explicit limitation of the statute and overruled it.  In its analysis of the remaining alleged acts, the *Garg* Court did not consider any of the acts which were outside of the statute of limitation.  And, once the time-barred acts which occurred during the immediate five years after plaintiff filed a grievance were omitted, the *Garg* Court found that no reasonable juror could find the requisite causal connection between plaintiff's filing of a grievance and the first adverse action which occurred within the statute of limitations.

The Court declines to consider alleged acts of harassment which occurred prior to January 21, 2002.  The *Garg* Court explicitly declined to consider time-barred acts for any purpose, even though they were related to acts which occurred within the statute of limitations.  Therefore, there is no basis to find that Michigan courts would be inclined to extend *Garg* to allow consideration of time-barred acts as "relevant background evidence" in support of claims brought within the statute of limitations, as is permitted under *Evans* for Title VII claims.  In fact, it is reasonable to read *Garg* as implicitly rejecting the *Evans* approach.

Therefore, the only alleged act of sexual harassment upon which Plaintiff can base her hostile work environment claim is the snow incident which occurred on

17

January 22, 2002.

### b.   Plaintiff failed to Establish a *Prima Facie* Claim of Hostile Work Environment Sexual Harassment

To establish a *prima facie* claim of hostile work environment sexual harassment,

a plaintiff must prove:

> (1) the employee belonged to a protected group;
>
> (2) the employee was subjected to communication or conduct on the basis of sex;
>
> (3) the employee was subjected to unwelcome sexual conduct or communication;
>
> (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and
>
> 5) respondeat superior.

*Radtke*, 442 Mich. at 382-383 (footnote omitted).  Plaintiff presented sufficient evidence

to support the first three elements.

For the fourth element, Plaintiff must show that the unwelcome sexual conduct

created an intimidating, hostile or offensive work environment.  The Court must consider

whether a reasonable person would have perceived the alleged conduct as creating

such an environment.  Id at 394.  Typically, a plaintiff can only make the necessary

showing by presenting evidence of a pattern of sexual harassment.  Single incidents of

sexual harassment are rarely sufficient to establish a hostile working environment,

unless the act is extreme, such as in cases of rape or violent sexual assault.  *Id* at 394-

395.

Plaintiff claims that, in the process of shoving snow down her shirt, Brown

18

grabbed her breast and tore her bra.  Statements by Brown and Plaintiff's co-worker cast doubt on the extent to which Plaintiff was upset by the incident.  Brown said Plaintiff did the same thing to him on a prior occasion.  Felicia Booker said that Plaintiff was laughing after Brown shoved snow down her shirt.  But, the Court must accept as true Plaintiff's denial that she typically engaged in reciprocal horseplay of a sexual nature with Brown and her claim that his behavior on January 22, 2002 was unwelcome.  Therefore, viewing the facts in a light most favorable to Plaintiff, reasonable jurors could find that Brown's alleged assault upon Plaintiff was sufficiently extreme and traumatic to create a hostile work environment in satisfaction of the fourth element of a *prima facie* claim.

Plaintiff's claim, nevertheless, fails on the final element--respondeat superior liability.  Under the ELCRA, an employer may avoid liability for alleged acts of sexual harassment by a co-worker or supervisor if the employer adequately investigated and took prompt and appropriate remedial action upon receiving notice of the alleged harassment.  *Radtke*, 442 Mich. at 396-397.

It is undisputed that Defendant conducted an investigation, which included questioning Brown and Plaintiff's co-workers, within days of receiving her complaint on January 25, 2002.  Defendant subsequently required employees to view a video reinforcing its sexual harassment policies.

Plaintiff does not identify any specific defects in the manner in which Defendant's investigation was conducted.  And, the remedial action taken by Defendant had the desired effect--Brown immediately discontinued the alleged harassment.

Plaintiff argues that Defendant is still liable because it should have terminated

19

Brown prior to the incident with Plaintiff because of his "record of harassment," and because Defendant had a history of not adequately responding to complaints. However, Plaintiff did not present any evidence that Brown had a record of harassment of which Defendant was or should have been aware, or that Defendant had a "history" of ignoring harassment complaints.

Defendant's motion for summary judgment on Count III is granted.

### D.    RETALIATION

Plaintiff alleges that Defendant took adverse action against her in retaliation for: 1) exercising her rights as a disabled individual, and 2) opposing a violation of the ELCRA by complaining of sexual harassment and testifying against Defendant in the Powell-Lee lawsuit.  There is insufficient evidence to support either claim.

The ELCRA prohibits retaliation for an exercise of rights under the Act:

> Two or more persons shall not conspire to, or a person shall not:
>
> (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

M.C.L. §37.2701(a).  The PWDCRA has a virtually identical retaliation provision.  M.C.L. §37.1602(a).[6]

------

[6]M.C.L. §37.1602(a) states that:

A person or 2 or more persons shall not do the following:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

To establish a *prima facie* case of retaliation under either Act, a plaintiff must show:

> (1) that [s]he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Garg*, 472 Mich. at 273; *Aho v Department of Corrections*, 263 Mich. App. 281, 288-289 (2004). If plaintiff makes the initial showing, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action taken. *Aho*, 263 Mich. App. at 289; *Hoffman v Sebro Plastics Inc.,* 108 F.Supp. 2d 757, 776 (E.D. Mich. 2000). If defendant meets its burden, it shifts back to the plaintiff to show by a preponderance that the asserted legitimate reason was mere pretext. *Id*.

First, Plaintiff does not articulate the basis of her claim that Defendant retaliated against her for exercising her rights under the PWDCRA. Presumably, her claim is based on her assertion that she was unfairly placed on a PIAP, given unfavorable performance evaluations and terminated, because she took multiple medical leaves of absence. However, Plaintiff has not demonstrated the fourth element of a *prima facie* claim--that there is a causal connection between her protected activity and the adverse actions taken.

"To establish a causal connection, a plaintiff must demonstrate that [her] participation in the protected activity was a 'significant factor' in the employer's adverse employment action, not merely that there was a causal link between the two events." *Aho*, 263 Mich. App. at 288. "[M]ere discriminatory or adverse action will not suffice as evidence of retaliation unless the plaintiff demonstrates a clear nexus between such

21

action and the protected activity." *Id.*

Here, Plaintiff was first placed on a PIAP on August 4, 2004, the day after she

returned from her first medical leave of absence.  But, Defendant began criticizing her

work performance long before then.  Plaintiff received negative performance evaluations

on August 10, 2003 and July 8, 2004.  And, with regard to the decision to fire Plaintiff,

Pressman testified that she ultimately recommended Plaintiff's termination after she

learned that Plaintiff failed to order the necessary nursing supplies in December 2004.

Notably, Plaintiff was first criticized by Defendant for failing to maintain the proper

inventory during her second evaluation on August 1, 2002, and in each evaluation

thereafter.   *See* Def. Exh. C.  This evidence suggests that each adverse action was

taken as a direct result of Plaintiff's poor work performance.  And, since Plaintiff has not

presented any contrary evidence or otherwise shown that Defendant actually had a

retaliatory motive, the Court finds that Plaintiff failed to establish a *prima facie* claim of

retaliation under the PWDCRA.

Plaintiff's proofs are similarly lacking with regard to her claim that Defendant

retaliated against her because she complained about Brown's sexual harassment.

Plaintiff again failed to articulate the basis of her claim.  That is, she does not indicate

what adverse action she is claiming was taken against her.  Plaintiff was disciplined for

cursing in the presence of a resident during the snow incident.  However, Plaintiff does

not deny cursing, nor does she present any evidence that Defendant's motive for

disciplining her was retaliatory.

Like claims of retaliation brought under the PWDCRA, "[t]o establish causation

for claims of retaliation under the ELCRA], the plaintiff must show that [her] participation

22

in activity protected by the [EL]CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Rymal v Baergen*, 262 Mich. App. 274, 303 (2004).  Here, Plaintiff presents no evidence upon which reasonable jurors could base a finding that Plaintiff's complaint was a significant factor in the decision to discipline her for improper conduct in front of HCR residents. Therefore, Plaintiff failed to make the requisite showing of causation to establish a *prima facie* case of retaliation on this ground.

Lastly, presuming that Plaintiff is asserting that she was fired, at least in part, because she gave deposition testimony against Defendant, there is no evidence to support this claim either.  As with the first two claims, there is no evidence of causation. Except for the fact that Pressman said that she first initiated conversation with Fairchild about firing Plaintiff on the same day (or soon after) Plaintiff gave testimony against Defendant, there is no evidence which suggests that Plaintiff's testimony was a factor in the decision to terminate her.

The timing of Pressman's decision, without more, is insufficient to establish causation.  *See Garg*, 472 Mich. at 286 (*quoting West v General Motors Corp.,* 469 Mich. 177, 186 (2003))("[I]n order to show causation in a retaliatory discrimination case, '[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.'").  Pressman stated that her decision was based solely on Plaintiff's work performance and, as outlined above, there is ample, unrefuted evidence to support Pressman's claim.  Plaintiff has not presented any evidence which suggests otherwise.  Therefore, Defendant's motion for summary judgment on Count IV is granted.

23

E.      INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff bases her claim of intentional infliction of emotional distress ("IIED") on Byron Brown's actions during the snow incident and contends that Defendant is vicariously liable.  Defendant contends that it cannot be held liable for intentional torts committed by employees which are outside the scope of their authority.  Defendant is correct.

"[I]n an employer-employee (master-servant) relationship, the employer may not be held liable for the acts of [its] employees which are beyond the scope of their employment."  *Borsuk v Wheeler,* 133 Mich. App. 403, 410 (1984).  "Intentional and reckless torts are generally held to be beyond the scope of employment."  *Id.*  However, 1 Restatement Agency, 2d §219(2) lists four exceptions to this general rule:

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> (a) the master intended the conduct or the consequences, or
>
> (b) the master was negligent or reckless, or
>
> (c) the conduct violated a non-delegable duty of the master, or
>
> (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, ***or he was aided in accomplishing the tort by the existence of the agency relation***.

(emphasis added).

Relying upon *Champion v Nationwide Security, Inc.,* 450 Mich. 702 (1996), and other cases which purportedly adopted the exception in §219(2)(d), Plaintiff asserts that a principal may be held liable for the intentional torts of its agent if the agent was aided in accomplishing the tort by the existence of the agency relationship.  In *Champion*, the

24

plaintiff was raped by her supervisor when he used his authority to schedule her work hours and assign her certain duties so that he and plaintiff would be alone.  Plaintiff sued her employer alleging quid pro quo sexual harassment.  Defendant asserted that it could not be held vicariously liable for the supervisor's actions because, to the extent he was acting as defendant's agent, he was not authorized to rape plaintiff.

The *Champion* Court rejected defendant's argument.  The Court stated that the employer's construction of agency principles was too narrow and, in a footnote, cited §219(2)(d) without further explanation.  The Court then stated that defendant's argument failed to recognize that "when an employer gives its supervisors certain authority over other employees, it must also accept responsibility to remedy the harm caused by the supervisors' unlawful exercise of that authority."  450 Mich. at 712.  The Court held that it was adopting "the nearly unanimous view that imposes strict liability on employers for quid pro quo sexual harassment committed by supervisory personnel."  *Id* (footnote omitted).

The presumption of one subsequent panel of the Michigan Court of Appeals was that the *Champion* Court adopted the §219(2)(d) exception.  *See Zsigo v Hurley Medical Center*, 2004 W.L. 952816 (Mich. App. 2004)(unpub. op.).  After briefing was complete in this matter, however, the Michigan Supreme Court in *Zsigo v Hurley Medical Center*, 475 Mich. 215 (June 14, 2006), expressly clarified that it did not adopt the §219(2)(d) exception in *Champion;* it further declined to do so in the case before it, where plaintiff was a patient in defendant's emergency room and alleged that she was raped by one of defendant's employee's while there for treatment.  The *Zsigo* Court indicated that it only made a passing reference to §219(2)(d) in *Champion*, and that its ruling was limited to

25

the distinct facts of that case.  The *Zsigo* Court then unequivocally declined to adopt the

exception:

> We decline to adopt the exception, which would create employer
> liability for the torts of an employee acting outside the scope of his or
> her employment when the employee is aided in accomplishing the
> tort by the existence of the agency relationship.

475 Mich. at 231.  In its analysis, the *Zsigo* Court noted that §219(2)(d) has been

criticized as overly broad:

> Courts have criticized §219(2)(d) primarily because the exception
> swallows the rule and amounts to an imposition of strict liability upon
> employers.  Indeed it is difficult to conceive of an instance when the
> exception would not apply because an employee, by virtue of his or
> her employment relationship with the employer is always "aided in
> accomplishing" the tort.  Because the exception is not tied to the
> scope of employment but, rather, to the existence of the employment
> relation itself, the exception strays too far from the rule of respondeat
> superior employer nonliability.

*Id* at 226 (footnotes omitted).  The *Zsigo* Court agreed that adopting the exception

would potentially subject employers to strict liability.  As in *Champion*, the Court noted

that courts which have applied the broad exception have done so primarily in sexual

harassment and discrimination cases when a *supervisory* employee used his agency

position to sexually harass an employee.  *Id* at 227.

 *Zsigo* makes clear that Plaintiff's reliance upon *Champion* is misplaced.

Michigan does not recognize the §219(2)(d) exception to the general rule that

employers are not liable for the intentional torts of their employees, except where a

supervisory employee uses his managerial authority to sexually harass a subordinate.

The alleged harasser here, however, was a co-worker who had no supervisory authority

over Plaintiff.  Therefore, Defendant's motion for summary judgment on Count V is

26

granted.

Because each of Plaintiff's claims will be dismissed, it is not necessary for the

Court to reach Defendant's assertion that Plaintiff failed to mitigate her damages.

**V.    CONCLUSION**

The Court **GRANTS** Defendant's Motion for Summary Judgment in its entirety.

**IT IS SO ORDERED.**


s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  September 7, 2006

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on September 7, 2006.<br><br>s/Linda Vertriest<br>Deputy Clerk |